Patrice FAGEN, Diane Havens, Valerie Kreimeyer, Connie Mitchell, Dorothy Riddle, Lori Noland, Pamela Jackson, Debra Gaffney, and Michael Roberts Plaintiffs,

v.

State of IOWA and Department of Inspections and Appeals, Defendants.

No. 4:02–CV–90186.

United States District Court, S.D. Iowa, Central Division.

Feb. 11, 2004.

Pamela J. Walker Sherinian & Walker Law Firm, West Des Moines, IA, for plaintiffs.

Gordon E. Allen, Jean M. Davis, Attorney General of Iowa, David S. Steward, Attorney General, Environmental Law Division, Des Moines, IA, for defendants.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Currently before the Court is a Motion for Summary Judgment by Defendants State of Iowa ("Iowa") and the Department of Inspection and Appeals ("DIA"). On April 22, 2002, Plaintiffs, eight current and former employees of the DIA, filed a complaint in this Court against Defendants under the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d). Plaintiffs claim that Defendants violated the Equal Pay Act by hiring a male, James Berkley, at a salary higher than that of Plaintiffs, to do substantially equal work. On May 14, 2003, upon Plaintiffs' motion, the Court dismissed without prejudice three of the original Plaintiffs in this action.[1] The Court has subsequently granted Plaintiffs' motions to add four additional Plaintiffs with the same claim against Defendants to the suit.[2]

On August 15, 2003, Defendants filed a Motion for Summary Judgment. The motion was fully briefed by the parties, and oral argument took place on December 24, 2003. The matter is now fully submitted.

---

1. The dismissed Plaintiffs are Barbara Braak, Alberta Currie, and Nancy McKnight.

2. The Plaintiffs added after the filing of the complaint are Lori Noland, Pamela Jackson, Debra Gaffney, and Michael Roberts. Michael Roberts is a female.

For the reasons discussed below, Defendants' motion is **denied**.

## I. FACTS[3]

The Plaintiffs in this action are all women, and all are current or former employees of Defendant Department of Inspections and Appeals. Plaintiffs all hold or have previously held the position of Health Facilities Surveyor with DIA. Health Facilities Surveyors are inspectors who conduct on-site inspections of the care, treatment, and services provided to the residents and patients of the facilities that are licensed and certified by the Department of Inspection and Appeals. The education and training of Health Facilities Surveyors can vary. Some are registered nurses, some are dieticians, some are qualified mental health professionals, and some are qualified mental retardation professionals. Among those who are registered nurses, some possess a B.S.N. degree, while others are either associate degree or diploma nurses.

Plaintiffs were all hired for the Health Facilities Surveyor position either before November of 2000 or after May of 2001, and were granted a starting salary commensurate with step 1 on a six-step pay scale established by DIA. Plaintiffs were informed that they were required to start at step 1 and that their beginning salaries were non-negotiable. From the wage information contained in the record, it appears that, at least with respect to Health Facilities Surveyors who were in the lower

steps of the pay grade, step increases were awarded approximately every year.[4]

James Berkley, the male comparator in this case, was hired as a Health Facilities Surveyor with DIA in May of 2001. Immediately prior to taking the Health Facilities Surveyor job, Mr. Berkley had been employed as the Director of Nursing at a facility in Ankeny, Iowa, a position he had held since November, 1999. At the time of his hire, Mr. Berkley had approximately eight years of nursing experience. There is some evidence in the record to indicate that the offer Mr. Berkley initially received was higher than step 1. Upon receiving the job offer from DIA, Mr. Berkley informed DIA of his salary at his current job, $47,000, and indicated that he could not take a significant pay cut and do the extensive travel required by the job. DIA came back to Mr. Berkley with an offer of a step 6 starting salary, the highest level of pay for Health Facilities Surveyors. Mr. Berkley accepted the job.

In February, 2000, a little over one year before Mr. Berkley was hired by DIA, Marvin Tooman became Division Administrator of DIA's Division of Health Facilities. At that time, the practice within the Division of Health Facilities had been that all Health Facilities Surveyors began their employment with DIA at a step 1 salary. Shortly after coming to DIA, Dr. Tooman sought and received approval from Kevin Techau, then the Director of DIA, to change this practice. Dr. Tooman's desire to change the practice was largely based

3. Unless otherwise noted, the facts in this section are undisputed. The Court notes that Defendants failed to file any response to Plaintiffs' Statement of Additional Facts, thus all facts enumerated therein are deemed admitted for the purposes of summary judgment, pursuant to Local Rule 56.1(d), and will be referenced in this section as undisputed facts.

4. Plaintiff Patrice Fagen, who was at step 1 prior to February 2001, was awarded step increases in February 2001, February 2002, and January 2003. Plaintiff Connie Mitchell, who was at step 3 prior to August 2001, was awarded step increases in August 2001 and August 2002. She retired in February 2003. Plaintiff Dorothy Riddle, who was at step 1 in February 2001, received step increases in February 2001, February 2002, and January 2003.

upon 1) the quality of people in the applicant pool for the HFS position; 2) prevailing market conditions (namely, a nursing shortage); and 3) DIA's immediate need for qualified candidates. There is a dispute in the record as to when the new practice permitting individualized determinations of starting salaries for Health Facilities Surveyors took effect. Plaintiff Dorothy Riddle testified that in a meeting she had with Dr. Tooman he told her that the new policy began in August of 2000. Steve Young, Deputy Director of the DIA, testified that the new practice of allowing individualized assessments took effect in January of 2001.

By approximately June, 2001, however, Defendants had discontinued the practice. Only three people, Mr. Berkley and two other women, Gerry Braynard and Cynthia Franklin, were hired under the advanced salary appointments policy. Ms. Braynard was hired at a step 3 and Ms. Franklin was hired at a step 2. Another woman, Tammy Torstenson, was offered a Health Facilities Surveyor position at a step 2 salary but ultimately declined the offer. Mr. Berkley was the last person hired under the policy. According to Steve Young, at some point on or after April 11, 2001, DIA received a directive from the state informing state agencies of the need to implement steps aimed at achieving $10 million in budgeted reversions. These budgetary concerns, along with unspecified "other concerns," caused the Department to "re-evaluate future individual advanced payment rate appointments."

Starting in June of 2001, various Plaintiffs, along with other co-workers, met with DIA management personnel to discuss the issue of the disparity in pay between Mr. Berkley and the previously hired Health Facilities Surveyors. Bureau Chief Kathy Sutton explained that Mr. Berkley's elevated salary was a result of DIA being turned down by candidates for the Health Facilities Surveyor position because of salary concerns, as well as a feeling that the nursing shortage required DIA to be competitive in salary with the private sector. Division Administrator Marvin Tooman justified Mr. Berkley's higher starting wage by indicating that he had researched the issue of the nursing shortage and that he had attended a lecture indicating that the nursing shortage was likely to get much worse in the future. Dr. Tooman indicated that he would look into reclassifying the Health Facilities Surveyor position job grade in the future and that, depending on negotiations with the union, all Health Facilities Surveyors might get a raise of a step or two. At a later meeting, however, Dr. Tooman indicated that the department did not have the funds to increase salaries for all the current Health Facilities Surveyors. Bureau Chief Paul Vanderburgh indicated that Mr. Berkley's higher wage was a result of the difficulty in finding qualified staff. DIA Director Kevin Techau indicated to Plaintiffs that the decision to hire Mr. Berkley at a higher starting salary was due to the market shortage of nurses.

At a group meeting attended by Plaintiffs Kreimeyer, Mitchell, and Riddle and three of their co-workers on August 24, 2001, Steve Young, Deputy Director of the DIA, told the assembled employees that Berkley's starting wage was higher based on his qualifications. While Young declined to address Berkley's specific qualifications, he indicated that the qualifications in general were education, experience, the position the applicant previously held, references, performance, and availability of applicants.

## II. SUMMARY JUDGMENT

### A. The Legal Standard

Federal Rule of Civil Procedure 56 (©) provides that summary judgment "shall be

rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if the dispute over it might affect the outcome of the suit under the governing law. *Id.*

The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. In meeting its burden, the moving party may support his or her motion with affidavits, depositions, answers to interrogatories, and admissions. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits or by the depositions, answers to interrogatories, and admissions on file, designate the specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56 (c), 56(e); *Celotex Corp.*, 477 U.S. at 322–323, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. The role of summary judgment is to "pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts University School of Medicine*, 976 F.2d 791, 794 (1st Cir.1992) (citations omitted). In order to survive a motion for summary judgment, the nonmoving party must present enough evidence for a reasonable jury to return a verdict in his or her favor. *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. In order for the moving party to prevail, it must estab-

lish its right to judgment with such clarity that there is no room for controversy. *Jewson v. Mayo Clinic*, 691 F.2d 405, 408 (8th Cir.1982).

On a motion for summary judgment, the Court is required to "view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences." *United States v. City of Columbia*, 914 F.2d 151, 153 (8th Cir.1990). The Court does not weigh the evidence or make credibility determinations. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.*

This Court is mindful in deciding whether to grant summary judgment in this case that the Eighth Circuit "has repeatedly cautioned that summary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based … Summary judgment is not appropriate unless all the evidence points one way and is susceptible to no reasonable inferences sustaining the position of the nonmoving party." *Hindman v. Transkrit Corp.*, 145 F.3d 986, 990 (8th Cir.1998) (citations omitted). *See also Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991)) ("summary judgment should seldom be used in employment-discrimination cases"); *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987), cert. denied, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989). This is because "inferences are often the basis of the claim … and 'summary judgment should not be granted unless the evidence could not support any reasonable inference' of discrimination." *Breeding v. Gallagher & Co.*, 164 F.3d 1151, 1156 (8th Cir.1999) (quoting *Lynn v.*

*Deaconess Med. Ctr.-West Campus,* 160 F.3d 484, 486–87 (8th Cir.1998)).

## B. Discussion

The Court does not believe that either party has fully or accurately set forth the standard under which this Court must analyze Plaintiffs' claim under the Equal Pay Act, 29 U.S.C. § 206(d). For the purpose of clarity, the Court sets forth at length the proper standard as articulated by the Supreme Court:

> The [Equal Pay] Act's basic structure and operation are ... straightforward. In order to make out a case under the Act, the Secretary must show that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.' Although the Act is silent on this point, its legislative history makes plain that the Secretary has the burden of proof on this issue ... The Act also establishes four exceptions—three specific and one a general catchall provision—where different payment to employees of opposite sexes 'is made pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor than sex.' Again, while the Act is silent on this question, its structure and history also suggest that once the Secretary has carried his burden of showing that the employer pays workers of one sex more than workers of the opposite sex for equal work, the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions. All of the many lower courts that have considered this question have so held, and this view is consistent with the general rule that the application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense on which the employer has the burden of proof.

*Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 196–97, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974) (citations omitted).

Defendants are correct in their assertion that claims under the EPA and wage discrimination claims under Title VII are analyzed identically. The Eighth Circuit examined this issue in detail in *McKee v. Bi–State Development Agency,* 801 F.2d 1014 (8th Cir.1986). The panel in *McKee* concluded that "[w]here a claim is for unequal pay for equal work based upon sex, the standards of the Equal Pay Act apply whether the suit alleges a violation of the Equal Pay Act or of Title VII." 801 F.2d at 1019. Defendants' argument that Plaintiffs' Equal Pay Act claim should be analyzed under the *McDonnell Douglas* burden-shifting paradigm, however, is incorrect.[5] The critical difference between the Equal Pay Act framework and the *McDonnell Douglas* burden-shifting paradigm is which party has the ultimate burden of proof on the issue of discrimination. Under the Equal Pay Act framework, once a plaintiff establishes that an employer paid employees of the opposite sex differing wages for equal work, the burden of proving that such a discrepancy was based upon a "factor other than sex" rests squarely upon the employer's shoulders. *Corning Glass Works,* 417 U.S. at 196–97,

---

**5.** In their initial resistance, Plaintiffs accepted Defendants' characterization of the burdens of proof and production under the Equal Pay Act. However, in Plaintiffs' supplemental brief in resistance to Defendants' motion, Plaintiffs did cite to *Taylor v. White,* 321 F.3d 710, 716 (8th Cir.2003), for the proposition that Defendants must prove the pay differential was based upon a factor other than sex.

94 S.Ct. 2223. Under the *McDonnell Douglas* burden-shifting paradigm, however, the burden on the employer once a plaintiff makes out a prima facie case is merely a burden of production; that is, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action taken against the claimant. *Bogren v. Minnesota,* 236 F.3d 399, 404 (8th Cir.2000). Once the employer does so, the presumption of discrimination drops out of the case. The ultimate burden of proving intentional discrimination remains at all times with the plaintiff. *Id.* (citing *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

Admittedly, the parties' lack of clarity on this issue may reflect in part a lack of clarity in a recent decision of this Circuit. In *Sowell v. Alumina Ceramics, Inc.,* 251 F.3d 678, 683 (8th Cir.2001), a panel of the Eighth Circuit held, in the context of a Title VII wage discrimination claim, that "[o]nce the Plaintiff has proven her prima facie case, the employer the bears the *burden of coming forward* with a legitimate nondiscriminatory factor upon which it based the wages paid." (citing 29 U.S.C. § 206(d)(1) and *Hutchins v. Int'l Brotherhood of Teamsters,* 177 F.3d 1076, 1080–81 (8th Cir.1999)) (emphasis added). The plain language of *Sowell* seems to indicate that the employer in a Title VII wage discrimination or EPA case has nothing more than the burden of production once a plaintiff has established a prima facie case. However, the case to which the *Sowell* panel cites for this proposition, *Hutchins*

*v. International Brotherhood of Teamsters,* clearly indicates that the employer bears the ultimate burden of proving that the wage disparity complained of was based on a factor other than sex. 177 F.3d at 1081. *Sowell,* then, is most easily understood as simply an anomaly in Eighth Circuit jurisprudence.[6]

### 1. Unequal Pay for Equal Work

#### a. Unequal Pay

The undisputed facts in this case demonstrate that the male comparator, James Berkley, was hired at a salary of $49,420.80, an amount greater than the annual salary of any of the current Plaintiffs in this lawsuit at the time Mr. Berkley was hired.[7] Furthermore, Mr. Berkley continues to be paid more than the Plaintiffs who are still employed as Health Facilities Surveyors.[8]

The State argues, however, that the Plaintiffs have failed to sufficiently establish the unequal pay prong because Plaintiffs were hired at a time when department policy dictated that all Health Facilities Surveyors were hired at the first step on the salary structure. Relying on *Sowell v. Alumina Ceramics, Inc.,* 251 F.3d 678, 684 (8th Cir.2001), Defendants argue that a plaintiff cannot prevail on a claim under the Equal Pay Act when at least some similarly situated employees of the opposite sex are paid identical wages.

In response, Plaintiffs point out the apparent inconsistency in the law of the Eighth Circuit on this point. In another case, *Hutchins v. Int'l Bhd. of Teamsters,*

---

**6.** Indeed, it would be nearly impossible to conclude otherwise, as a decision by the *Sowell* Court holding that the employer bears only the burden of production on the issue of any nondiscriminatory reason for an established wage disparity would directly contradict the Supreme Court's decision in *Corning Glass Works v. Brennan,* 417 U.S. 188, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974).

**7.** The three former Plaintiffs who were voluntarily dismissed from the suit, Barbara Braak, Alberta Currie, and Nancy McKnight, each made approximately $53,000 at the time Mr. Berkley was hired.

**8.** Two of the Plaintiffs, Diane Havens and Valerie Kreimeyer, have left their employment with the State.

177 F.3d 1076, 1081 (8th Cir.1999), a panel of the Eighth Circuit upheld this district court's finding that a female plaintiff whose salary was less than that of 12 male co-workers who performed the same job as her, but identical to the salary of eight other male co-workers who also performed equal work, established a prima facie case of discrimination under the Equal Pay Act and Title VII.

This apparent inconsistency was analyzed at length by the district court in *Hennick v. Schwans Sales Enterprises, Inc.*, 168 F.Supp.2d 938 (N.D.Iowa 2001). While this Court disagrees with the *Hennick* court's articulation of the burdens of proof and production under the Equal Pay Act,[9] the Court does agree with the *Hennick* court's conclusion that the *Hutchins* rule is the more appropriate in the EPA context. Particularly persuasive is the fact that following the rule articulated in *Sowell* would lead to the perverse result that a female employee could not make out a case of wage discrimination even where she was one of ten females paid half as much as nine males for equal work, so long as a tenth male made the same as or less than the female workers. *See Hennick*, 168 F.Supp.2d at 950. "In such circumstances, however, it seems at least highly likely that the employer is 'discriminat[ing] between employees on the basis of sex,' 29 U.S.C. § 206(d)(1), but the employer would nevertheless be insulated from suit by the rule stated in *Sowell.*" *Id.*

■ While this Court agrees with the panel's conclusion in *Hutchins*, the issue is not even squarely presented on the facts in the record here. There has been no evidence presented that any male hired prior to James Berkley actually made the same salary as any of the female Plaintiffs in this case. The Defendants attempt to create such an inference by stating the department policy prior to January or February of 2001 was that all Health Facilities Surveyors were brought in at step 1 of the salary structure. However, Defendants have presented no direct evidence that any of the Health Facilities Surveyors hired prior to Mr. Berkley were male. At oral argument, counsel for both Plaintiffs and Defendants agreed that because of the history of hiring nurses as Health Facilities Surveyors, the job has primarily been filled by women. Counsel for Defendants further admitted that he did not know how many of the Health Facilities Surveyors, if any, were male. At the summary judgment stage all reasonable inferences must be drawn in favor of the non-moving party; here, the Plaintiffs. The inference could surely be made, in the absence of any evidence to the contrary, that the lack of evidence regarding other male Health Facilities Surveyors is an indication that there were no other males employed in this position prior to Mr. Berkley.

The Court notes that Defendants have presented testimony that other male Health Facilities Surveyors were hired "at or around the same time as the new Plaintiffs."[10] The Court believes that, to the extent Defendants attempt to rely on the salaries of male Health Facilities Surveyors hired after Mr. Berkley and after Plaintiffs had already informally raised a number of concerns about the disparity between their own salaries and that of Mr. Berkley, a factual dispute is still raised on the issue of unequal pay. A reasonable

**9.** The Hennick court analyzed the plaintiff's wage discrimination claim under the *McDonnell Douglas* burden-shifting framework. 168 F.Supp.2d at 949–50. For a discussion of this issue, see *infra* at p. 1001–1003.

**10.** The new Plaintiffs are Lori Noland, Pamela Jackson, and Debra Gaffney. Pamela Jackson was hired on October 23, 2000. Lori Noland was hired on June 18, 2001, and Debra Gaffney was hired on January 28, 2002.

inference in such a situation is that Defendants began paying male Health Facilities Surveyors equally because of their fear of liability for wage discrimination. If such comparisons were permitted to override a female employee's EPA claim, an employer could insulate itself from liability after the fact by simply hiring at least one man at the same or lower salary than any women who complained of wage discrimination.

b. Equal Work

■ The second prong of Plaintiffs' prima facie case is a showing that the Plaintiffs and the male comparator performed equal work. The female Plaintiffs in this matter and the male comparator they have put forward, James Berkley, all had the same job classification: Health Facilities Surveyor within the Department of Inspections and Appeals. Generally speaking, Health Facilities Surveyors are inspectors who conduct on-site inspections of the care, treatment, and services provided to the residents and patients of the facilities and regulated living environments licensed and certified by the Department of Inspection and Appeals.

In arguing that the work performed by Mr. Berkley, the male comparator, and the female Plaintiffs in this lawsuit is not equal work for the purposes of establishing a prima facie case, Defendants point to the following characteristics of the Health Facilities Surveyor position: 1) the investigations performed by Health Facilities Surveyors differ by type of facility, type of survey, and level of complexity; 2) depending on their program coordinator, some Health Facilities Surveyors have more discretion than others in determining their work assignments; 3) some Health Facilities Surveyors only occasionally perform on-site inspections; 4) some Health Facilities Surveyors are educated and licensed as nurses or dieticians, while many do not possess such education; 5) some Health Facilities Surveyors possess a B.S.N. de-

gree in nursing, while others are associate degree or diploma nurses; 6) some Health Facilities Surveyors are qualified mental health professionals; and 7) some Health Facilities Surveyors are Surveyor Minimum Qualification Testing qualified. In addition, Defendants provide examples of various duties and responsibilities different Health Facilities Surveyors may be called upon to carry out. Defendants also point out specific differences between the duties of Mr. Berkley and several of the individual Plaintiffs in this lawsuit.

■ According to Defendants, these varying job characteristics demonstrate that, while the skills of Mr. Berkley and the Plaintiffs may be comparable, they are not substantially equal. Citing *County of Washington v. Gunther*, 452 U.S. 161, 188, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), Defendants argue that the jobs must be "identical or nearly so, hence unarguably of equal worth." The standard, however, is not so rigid as Defendants assert. " 'Insubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable." ' *Krenik v. County of LeSueur*, 47 F.3d 953, 961 (8th Cir.1995) (quoting 29 C.F.R. § 1620.14(a)). Comparing jobs on the basis of equal skill, effort, or responsibility requires

> 'practical judgment on the basis of all the facts and circumstances of a particular case. Skill includes such considerations as experience, training, education, and ability. Effort refers to the physical or mental exertion necessary to the performance of a job. Responsibility concerns the degree of accountability required in performing a job.' *E.E.O.C. v. Universal Underwriters Ins. Co.*, 653 F.2d 1243, 1245 (8th Cir.1981).

*Id.* at 960.

Plaintiffs do not dispute that the specific tasks performed by the various Health

Facilities Surveyors differ in the manner Defendants assert. Plaintiffs argue, however, that while individual tasks may vary somewhat, it is for the jury to determine whether the differences between Mr. Berkley's job and their own are "insubstantial or minor." In support of their argument that these differences are insubstantial and minor, Plaintiffs point to the fact that all Health Facilities Surveyors conduct on-site inspections or licensing and certification surveys in accordance with established protocol. Plaintiffs have presented evidence that indicates that the surveys vary depending on the type of survey being performed and the type of facility involved, but that there is very little difference in the responsibility, skill, and effort required for each type of survey.

Further supporting Plaintiffs' argument that there is a genuine factual dispute as to whether Plaintiffs and Mr. Berkley performed equal work is the testimony of Christine Gafney–Peden, a personnel officer for the Department of Inspections and Appeals. Ms. Gafney–Peden indicated in her deposition that state job classifications are established through a comparable work study and that individuals in the position of Health Facilities Surveyors would have similar job duties, responsibilities, and skills.

Defendants admit that prior to the hiring of Mr. Berkley and two other women in 2001, department practice dictated that all DIA health facilities surveyors were hired at the first step of the salary structure. "In determining whether job differences are so substantial as to make jobs unequal, it is pertinent to inquire whether and to what extent significance has been given to such differences in setting the wage levels for such jobs." 29 C.F.R. § 1620.14. It is significant that all Health Facilities Surveyors, who Defendants argue do not all perform equal work, had prior to the year 2001 always started work

for the DIA at the same salary. In other words, the fact that Plaintiffs and James Berkley are all classified as Health Facilities Surveyors does not necessarily mean that they do equal work; however, the fact that the wage level has always been identical for individuals with this job classification creates a fact issue as to whether the work is substantially equal.

In summary, the Court believes that the testimony of various Plaintiffs, as well as a DIA personnel officer, indicating that all the Health Facilities Surveyors performed equal, similar, or comparable work and the fact that the Health Facilities Surveyors had historically received equal pay upon beginning work create a genuine factual dispute about whether the work performed by Plaintiffs and Mr. Berkley was equal such that a reasonable factfinder could return a verdict for the Plaintiffs on the issue of equal work.

### 2. Disparity Based on "Factor Other than Sex"

The Supreme Court has held that "although the Equal Pay Act expressly permits employers to pay different wages to women where disparate pay is a result of a 'factor other than sex,' see 29 U.S.C. § 206(d)(1), ... it is the employer, not the employee, who must prove that the actual disparity is not sex-linked." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 248, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 196, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)). Having concluded that the Plaintiffs have presented evidence from which a reasonable jury could conclude that the Defendants paid Plaintiffs and the male comparator, James Berkley, different wages for equal work, the Court must now decide whether Plaintiffs have established the existence of a genuine dispute sufficient to avoid summary judgment

as to whether the disparity in pay was based on a factor other than sex. "The burden of proving that a factor other than sex is the basis for a wage differential is a heavy one." *Brennan v. Owensboro–Daviess County Hospital,* 523 F.2d 1013, 1031 (6th Cir.1975), cert. denied, 425 U.S. 973, 96 S.Ct. 2170, 48 L.Ed.2d 796 (1976). The fact that Defendants bear the burden of proving that any wage differential was based on a factor other than sex has an impact on this Court's summary judgment analysis. "Summary judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turner v. Ferguson,* 149 F.3d 821, 824 (8th Cir.1998).

Defendants have posited two main reasons for the discrepancy in wages between Mr. Berkley and the female Plaintiffs in this action. First, they argue that Mr. Berkley, unlike Plaintiffs, was hired at a time when DIA departmental policy permitted individual salary determinations regarding new employees. Second, they argue that Mr. Berkley, based upon his credentials prior to entering DIA employment, engaged in pre-employment contract negotiations to arrive at an agreeable starting salary.

Prior to approximately January of 2001, the practice in the DIA Division of Health Facilities had been to hire all new Health Facilities Surveyors at step 1 of a six-step pay grade. From the record, it appears that step increases were awarded approximately every year. Operating upon this assumption, it would take an employee who was hired at step 1 approximately five years to advance to step 6, the highest step of the pay grade. This policy was changed by Dr. Marvin Tooman and Kevin Techau around either mid–2000 or early 2001. A number of factors, including DIA's immediate need for qualified candidates, the quality of candidates in the applicant pool, and a nursing shortage contributed to the decision to modify the policy to permit individualized determinations of starting salaries for Health Facilities Surveyors.

Three people were hired at advanced step rates under the individualized assessment policy. Two female Health Facilities Surveyors, Gerry Braynard and Cynthia Franklin, were hired before James Berkley was hired. Gerry Braynard was hired at a step 3, three steps below the salary at which James Berkley was hired. Ms. Braynard was a licensed nursing home administrator with eight years of management experience in the field of long-term care. Additionally, she had a masters degree in nursing and was a doctoral candidate at the time she was hired. Her reference checks were good and she was "impressive on the interview." Betty Tschetter, a human resources executive with DIA, testified that step 3 was the "salary [Ms. Braynard] needed."

Cynthia Franklin was hired at a step 2. The parties have not pointed the Court to any evidence in the record elaborating upon Ms. Franklin's experience prior to accepting the HFS position. Plaintiff Dorothy Riddle did testify that during a June 20, 2001 meeting with Kathy Sutton, a DIA bureau chief, Ms. Sutton informed Ms. Riddle and a co-worker, Cathy Todd, that two other female surveyors had started at a rate higher than step 1. Plaintiff Riddle testified that "[w]e found out later they were surveyors who transferred in from other government positions."

James Berkley initially interviewed for the Health Facilities Surveyor position with Kathy Sutton and Paul Vanderburgh, two DIA bureau chiefs. At the time of his interview, Mr. Berkley was employed as Director of Nursing at On With Life, a facility in Ankeny, Iowa, and had held that position for approximately one and one-half years. Mr. Berkley had received a degree in 1993 from the diploma nursing

program at Mercy College. A diploma nursing degree, according to the record, is something less than a bachelor's degree in nursing. After receiving his degree, Mr. Berkley worked for approximately four years as a licensed practical nurse then a registered nurse. In 1997, he became Unit Coordinator of the Intensive Care Unit at Mercy Hospital in Des Moines, Iowa. In April of 1999 he became Donation Coordinator for the Iowa Donor Network, and continued that position until his appointment as Director of Nursing at On With Life in November of 1999. Betty Tschetter, a human resources executive with DIA, indicated that Mr. Berkley's reference checks were "wonderful" and that "[w]e were told that if we could get him at any salary it was worth it. He was a director of nursing."

Upon being offered the Health Facilities Surveyor position by Kathy Sutton and Paul Vanderburgh, Mr. Berkley informed them that he was making approximately $47,000 at On With Life and that he could not take a significant pay cut and engage in the travel required by the job. According to Mr. Berkley, Mr. Vanderburgh and Ms. Sutton "stated that they would discuss it and contact me back." They subsequently contacted Mr. Berkley and offered him the Health Facilities Surveyor position at a step 6 salary, above what he was making as Director of Nursing at On With Life. Steve Young, Deputy Director of the DIA, testified that Mr. Berkley specifically made a higher salary demand, but Mr. Vanderburgh and Ms. Sutton, the bureau chiefs who offered the job to Mr. Berkley, cannot recall whether Mr. Berkley made a specific demand.

There is undisputed evidence in the record that James Berkley, Gerry Braynard, and Cynthia Franklin are the only Health Facilities Surveyors to have been hired at above a step 1 pay rate. However, at least one other individual, Tammy Torstenson, was offered a job at an increased step level during the time that the DIA allowed individualized salary increases for new hires into the position of Health Facilities Surveyor. Ms. Torstenson is a registered nurse who interviewed for a position with DIA as a Health Facilities Surveyor in approximately February of 2001. She has been a registered nurse since 1984, has been certified as a gerentology RN since 1997, and as of October 2003 had approximately 12 years of experience in long-term care facilities. Ms. Torstenson was the Director of Nursing at a facility in Des Moines, Iowa for approximately ten years. She was initially interviewed by Kathy Sutton and Paul Vanderburgh, the two DIA bureau chiefs who later interviewed and hired James Berkley. It was "apparent" to Ms. Torstenson from the information she was given during her initial interview that the starting salary for the Health Facilities Surveyor position was set at step 1. Ms. Torstenson was under the impression that this starting salary was non-negotiable. Ms. Torstenson was actually offered the Health Facilities Surveyor position at the step 2 pay level. She ultimately turned down the job because of the extensive travel required; however, the record is unclear as to whether she told any representative of Defendants of her reason for declining the job. After indicating that she could not take the position, no representative of DIA ever offered Ms. Torstenson a higher salary in an effort to entice her to change her mind.

To rebut Defendants' explanation about the DIA's new practice as the true reason for Mr. Berkley's advanced rate appointment, Plaintiffs have presented evidence that two Plaintiffs hired after Mr. Berkley, Lori Noland and Debra Gaffney, were not appointed at advanced rates. Both of these Plaintiffs took a pay cut in order to accept the HFS position. Ms. Noland was specifically informed at her interview that

the initial salary was non-negotiable. Ms. Gaffney was informed that everyone starts at the bottom of the pay scale and inferred from that that there would be no negotiation as to her starting wage.

In response, Defendants explain that, subsequent to Mr. Berkley's hire, the Department ceased the practice of permitting individual advanced rate appointments. Steve Young, Deputy Director of the DIA, testified that the practice ended because "the Department and the State of Iowa were faced with budgetary issues and other concerns that caused the Department to re-evaluate future individual advanced payment rate appointments." Specifically, Mr. Young testified that on or after April 11, 2001, DIA received a directive from the State of Iowa Department of Management informing state agencies of the need to implement steps aimed at achieving $10 million in budgeted reversions. The record indicates that at the time Ms. Noland was hired on June 18, 2001, approximately one month after James Berkley's hire date, she was told that the salary she was being offered, a step 1 salary, was non-negotiable.

The Court finds that, on the evidence presented in the summary judgment record, Defendants have not conclusively established that Mr. Berkley's higher salary was based upon a factor other than sex. Although Defendants claim that the new policy permitting advanced salary appointments accounts for Mr. Berkley's higher salary, there is undisputed evidence in the record that Mr. Berkley's wage rate at hire was also dramatically higher than the wage rates of the women hired and offered jobs during the period of the new practice. The sheer size of the gap in steps between Mr. Berkley's pay and that of the other women hired during the advanced salary appointments window calls into question Defendants' assertion that the salary decision was based on the new policy alone.

The step 6 appointment essentially granted Mr. Berkley the equivalent of five years of seniority with DIA. Had he been appointed at a step 1, the record evidence permits the inference that it would have taken him approximately five years to work up to a step 6. Even had he been appointed at a step 2, like Tammy Torstenson or Cynthia Franklin, or at a step 3, like Gerry Braynard, he would still have had to work an additional two to three years before attaining the salary he made upon hire.

It is not the duty of this Court to weigh evidence at the summary judgment stage. Defendants' counsel acknowledged at oral argument that if the case boiled down to examining the qualifications of Mr. Berkley as compared to various female Health Facilities Surveyors, a fact issue would be presented that a jury would need to resolve. The Court believes that comparing the qualifications of Mr. Berkley and the other women hired during the advanced salary appointment window is relevant in this case. Defendants rely on the advanced salary appointment policy to defend Mr. Berkley's salary; however, if similarly qualified women were offered substantially less money even while the new policy was in place, a reasonable factfinder could conclude that the policy was not in fact the true reason for Mr. Berkley's higher salary.

Finally, Defendants have argued that it was not the new salary policy alone, but the new policy combined with Mr. Berkley's salary negotiations, that resulted in his step 6 salary. The Court finds that there is a factual dispute regarding whether Mr. Berkley's negotiating attempts were the true reason that he was paid more than other female Health Facilities Surveyors. It is undisputed that a number of Plaintiffs, hired before and after the window of the new policy, were explicitly

told that the step 1 starting salary was non-negotiable. Defendants' argument appears to be that, within the context of the new salary policy, Mr. Berkley's negotiations caused him to receive a higher salary. That is, the new policy enabled Mr. Berkley to negotiate, which Plaintiffs were not permitted to do, and as a result of these negotations Mr. Berkley received a step 6 salary. The implication appears to be that had Mr. Berkley not actively negotiated he would have received a lower step increase, perhaps the type of starting salary offered to Cynthia Franklin or Gerry Braynard, and his salary would be less disproportionate to that of Plaintiffs. But, since step 6 was what he required to accept the job, he received it. The Court believes that the evidence in the record regarding Tammy Torstenson's job offer from DIA calls this into dispute. Ms. Torstenson, who had seemingly similar qualifications to Mr. Berkley, including many years as a Director of Nursing and significant long-term care experience, was offered a step 2 starting salary. Like Mr. Berkley, Ms. Torstenson declined the offer. Where DIA made a counteroffer to Mr. Berkley, Ms. Torstenson received no such counteroffer. A dispute, then, exists as to whether Mr. Berkley received a step 6 salary offer because of his shrewd negotiating skills or because he was a man.

 As Defendants have pointed out, both in their briefing and at oral argument, federal courts do not sit as "super-personnel department[s]" to re-examine the business decisions of an employer. *Kipp v. Missouri Highway and Transp. Comm'n*, 280 F.3d 893, 898 (8th Cir.2002) (citation omitted). While it is true that an employer has wide latitude to make business decisions, even where those decisions are arbitrary, ridiculous, or irrational, it is equally true that an employer's business decisions can and must be scrutinized where an inference can be drawn that those decisions were the result of discrimi-

nation. *See McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511–12 (8th Cir. 1995). The Court notes that the record evidence in this case is not so one-sided that a reasonable factfinder could only conclude that the decision to hire Mr. Berkley at a step 6 salary, three steps higher than the starting salary of any of the female Health Facilities Surveyors, was due to a factor other than sex.

> Whatever the early life of a federal judge, she or he usually lives in a narrow segment of the enormously broad American socio-economic spectrum, generally lacking the current real-life experience required in interpreting subtle sexual dynamics of the workplace based on nuances, subtle perceptions, and implicit communications.

*Gallagher v. Delaney*, 139 F.3d 338, 342–43 (2d Cir.1998) (citations omitted). In a case where the type of conflicting evidence found here exists, "it would be a mistake for the court to usurp the role of the jury." *Lawrence v. CNF Transp., Inc.*, 340 F.3d 486, 495 (8th Cir.2003) (affirming district court's submission of plaintiff's Equal Pay Act claim to jury). As such, summary judgment is not warranted.

## III. ORDER

For the reasons detailed above, Defendants' Motion for Summary Judgment is hereby denied.

IT IS SO ORDERED.